# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

CAREFIRST OF MARYLAND,
INCORPORATED, d/b/a Carefirst Blue
Cross/Blue Shield,
                    *Plaintiff-Appellant,*

v.

CAREFIRST PREGNANCY CENTERS,
INCORPORATED, d/b/a Carefirst,
                    *Defendant-Appellee,*

and

NETIMPACT, INCORPORATED,
                    *Defendant.*

No. 02-1137

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Catherine C. Blake, District Judge.
(CA-01-1578-CCB)

Argued: April 3, 2003

Decided: July 2, 2003

Before WILKINS, Chief Judge, and MOTZ and
KING, Circuit Judges.

Affirmed by published opinion. Judge King wrote the opinion, in
which Chief Judge Wilkins and Judge Motz joined.

## COUNSEL

**ARGUED:** Ruth Mae Finch, STEVENS, DAVIS, MILLER &
MOSHER, L.L.P., Washington, D.C., for Appellant. Frederick Chris-

topher Laney, NIRO, SCAVONE, HALLER & NIRO, Chicago, Illinois, for Appellee. **ON BRIEF:** Barth X. deRosa, STEVENS, DAVIS, MILLER & MOSHER, L.L.P., Washington, D.C., for Appellant. Raymond P. Niro, Jr., Matthew G. McAndrews, NIRO, SCAVONE, HALLER & NIRO, Chicago, Illinois, for Appellee.

---

**OPINION**

KING, Circuit Judge:

In this appeal, we address whether an Illinois organization subjected itself to personal jurisdiction in Maryland by operating an Internet website that allegedly infringed the trademark rights of a Maryland insurance company. Carefirst of Maryland ("Carefirst") accuses Chicago-based Carefirst Pregnancy Centers, Inc. ("CPC") of selecting the name CAREFIRST, despite having notice both of Carefirst's federal registrations for CAREFIRST and of Carefirst's common law use of the CAREFIRST mark. Carefirst brought suit against CPC in the District of Maryland, alleging infringement and dilution of its trademark. The court dismissed the case without prejudice for lack of personal jurisdiction over CPC. Carefirst asks that we vacate the dismissal on the ground that Carefirst has made the requisite prima facie showing that CPC is subject to personal jurisdiction in Maryland. In the alternative, Carefirst seeks remand to the district court for jurisdictional discovery. Because the district court properly resolved the jurisdictional issue, we affirm its dismissal of this trademark action.

I.

A.

Carefirst, a Maryland corporation with its principal place of business in Maryland, is one of the nation's largest healthcare insurance companies. It is a non-profit BlueCross BlueShield licensee, primarily in the business of selling prepaid healthcare plans. BlueCross BlueShield is an association of independent health plans, which, since the 1930s, have been chartered to operate in geographically distinct terri-

tories. Carefirst operates exclusively within the mid-atlantic region of the United States; the majority of its 3.1 million members resides in Maryland and in the nearby states of Pennsylvania and West Virginia.

Among the services covered by Carefirst's trademark and service mark in the CAREFIRST name are "educational services, namely, conducting seminars, classes, workshops and lectures on nutrition, infant care, prenatal care, fitness, weight reduction, stress management and substance abuse." Carefirst advertises and promotes its products and services extensively via the Internet at www.carefirst.com. Its website includes information on health education classes in pregnancy, child birth, and infant care, and it provides pregnancy-related educational materials.

## B.

CPC, an Illinois corporation with its principal place of business in Illinois, is a non-profit, evangelical, pro-life advocacy organization. CPC's professed mission is to "care[ ] for Chicago-area women in pregnancy-related crisis by meeting their emotional, physical and spiritual needs, enabling them to choose life." The organization originally incorporated in 1985 under the name "Loop Crisis Pregnancy Center," but it changed its name in 1993 to "ChicagoCare Pregnancy Centers," and then in 1999 to "Carefirst Pregnancy Centers, Inc. d/b/a Carefirst."

CPC is headquartered in Chicago, Illinois, and it has no physical presence in Maryland: it has no offices, no telephone listing, no employees, and no agents there. Nor does CPC directly solicit funds from individuals in Maryland. And, according to the declaration of CPC's president, Nancy W. Good, CPC has never even provided counseling services to anyone in Maryland. CPC's sole contact with Maryland springs from its operation of an Internet website, accessible from anywhere in the world through any one of several web addresses.

In 1998, CPC entered into a contract with NetImpact, Inc.,

a web hosting[1] and web development[2] company incorporated in Delaware and headquartered in Ocean Pines, Maryland. On CPC's behalf, NetImpact purchased several domain names,[3] including "www.carefirstpc.com," "www.carefirstpc.org," "www.carefirstpc.net," "chicagocare.org," "love4real.org," and "care1pregnancy.com." Between November 5, 1998, and November 20, 2001, NetImpact submitted twenty-three invoices to CPC's Illinois address for the web hosting services that NetImpact provided during the period.[4]

CPC uses its various domain names to direct Internet traffic to CPC's website, throughout which the CAREFIRST name appears. On that website, CPC solicits donations; educates pregnant women about nutrition, infant care, and prenatal care; provides references to Chicago-area medical doctors and hospitals; promotes its counseling services and parenting classes; and advertises the pregnancy tests and ultrasound services that it offers free of charge. The website asserts at several points that the geographic focus of CPC's activities is the Chicago metropolitan area.

In soliciting donations, CPC's website offers prospective donors two methods of contribution: (1) they can call an advertised toll-free number and make a credit card transaction over the phone; or (2) they can make a credit card donation directly through the website. In either case, the donor's name and address are recorded in CPC's database, and the donor thereafter receives advertising materials through the

---

[1]"Web hosting" is a service provided by companies that have a direct connection to the Internet. When an individual wants to create a website, he can contract with one of these host companies to rent space on the host's Internet-connected "server" computer. For a fee, the individual is permitted to save his website files on the host's server; the host, in turn, maintains the server and the Internet connection.

[2]"Web development" refers to the design and programming of a website.

[3]A "domain name" is a unique Internet address that serves as the primary identifier of an Internet user. *See Panavision Int'l, L.P. v. Toeppen*, 938 F. Supp. 616, 618 (C.D. Cal. 1996).

[4]The CPC website itself was created, and now is administered and maintained, by Highgate Cross, Inc., a Chicago-area company.

mails. If the donation is made online, the donor also receives a thank-you e-mail.

CPC has acknowledged that it received $1,542 in donations (about 0.0174% of its total donation receipts) from Maryland residents between 1991 and September of 2001. Of this amount, only $120 was donated (by nine different Marylanders) after CPC adopted the name "Carefirst Pregnancy Centers, Inc.," in 1999. Apart from a single online donation made by the lawyer for Carefirst in this proceeding, there is no evidence that the Maryland donations were made through the website.

## II.

On October 26, 2000, shortly after learning of CPC's use of the CAREFIRST name and mark, Carefirst transmitted a cease-and-desist letter to CPC. After attempting to resolve the dispute, Carefirst, on May 31, 2001, filed suit against CPC and NetImpact in the District of Maryland.

CPC responded by filing a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, supported by the declaration of its president, Nancy W. Good. After obtaining several extensions of time, Carefirst filed a motion requesting both limited jurisdictional discovery and another extension of time in which to respond to the motion to dismiss. CPC opposed Carefirst's motion, maintaining that discovery was unwarranted since Carefirst had failed to make a prima facie case for personal jurisdiction.

On January 2, 2002, the court dismissed the action, without prejudice, for lack of personal jurisdiction, and it denied Carefirst's discovery request.[5] *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*,

---

[5]On March 28, 2002, the district court entered a Consent Judgment for trademark infringement, dilution, and unfair competition against CPC's co-defendant, NetImpact, enjoining that company from creating or maintaining an Internet website or link under the CAREFIRST mark and name, and releasing NetImpact from damages based upon NetImpact's compliance with the Consent Judgment and terms of the settlement agreement. As part of Carefirst's and NetImpact's settlement, NetImpact's president and owner agreed to give testimony regarding CPC's contacts with NetImpact.

Mem. Op., Civ. No. CCB-01-1578 (D. Md. Jan. 2, 2002) (the "Opinion"). In granting CPC's motion to dismiss for lack of personal jurisdiction, the court found that CPC operated primarily in Chicago; had no office, telephone listing, employees, agents, or sales representatives in Maryland; had never directly solicited funds from Maryland residents or otherwise targeted the forum; had received a *de minimus* portion of its charitable contributions from Maryland residents; and had recived nearly all of those contributions by mail, rather than online. Opinion at 1. The court went on to find that CPC's only connections to Maryland arose from the facts that (1) its website could be accessed from anywhere in the world, including Maryland; and (2) the website's "host" was a Maryland corporation. *Id.* On this basis, the court concluded that CPC did not have sufficient contacts with Maryland to support personal jurisdiction in the Maryland courts. *Id.*[6]

On January 11, 2002, Carefirst sought reconsideration of the dismissal. Then, on March 12, 2002, it filed a motion to vacate the dismissal on the basis of newly discovered evidence of CPC's contacts with Maryland, which Carefirst had obtained from NetImpact's president. The court denied the motion for reconsideration on March 29, 2002, *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, Order, Civ. No. CCB-01-1578 (D. Md. Mar. 29, 2002), and it denied the motion to vacate on July 17, 2002, *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, Order, Civ. No. CCB-01-1578 (D. Md. July 17, 2002) (the "July Order"). Carefirst timely appealed the dismissal of its complaint, the denial of its motion for reconsideration, and the denial of its motion to vacate. We possess jurisdiction pursuant to 28 U.S.C. § 1291.

### III.

We review de novo a dismissal for lack of personal jurisdiction, *Kohler v. Dodwell*, 152 F.3d 304, 307 (4th Cir. 1998), though we review any underlying factual findings for clear error, *see In re*

---

[6]Two days later, on January 4, 2002, the court informed counsel for Carefirst that, although the court had not had an opportunity to review Carefirst's reply brief before denying Carefirst's motion for discovery and an extension of time, it subsequently had done so and remained convinced that its January 2 ruling was correct.

*Celotex Corp.*, 124 F.3d 619, 627 (4th Cir. 1997). When personal jurisdiction is properly challenged under Rule 12(b)(2), the jurisdictional question is to be resolved by the judge, with the burden on the plaintiff ultimately to prove grounds for jurisdiction by a preponderance of the evidence. *Mylan Labs., Inc. v. AKZO, N.V.*, 2 F.3d 56, 59-60 (4th Cir. 1993). When, however, as here, a district court decides a pretrial personal jurisdiction motion without conducting an evidentiary hearing, the plaintiff need only make a prima facie showing of personal jurisdiction. *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989). In deciding whether the plaintiff has made the requisite showing, the court must take all disputed facts and reasonable inferences in favor of the plaintiff. *See Mylan Labs.*, 2 F.3d at 60.

We review a district court's discovery orders for abuse of discretion. *See id.* at 64. We also review for abuse of discretion the denial of a Rule 6(b)(1) motion for extension of time. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990).

IV.

A.

Under Federal Rule of Civil Procedure 4(k)(1)(A), a federal court may exercise personal jurisdiction over a defendant in the manner provided by state law. *See ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 622 (4th Cir. 1997). Thus, for a district court to assert personal jurisdiction over a nonresident defendant, two conditions must be satisfied: (1) the exercise of jurisdiction must be authorized under the state's long-arm statute; and (2) the exercise of jurisdiction must comport with the due process requirements of the Fourteenth Amendment. *Christian Sci. Bd. of Dirs. of the First Church of Christ v. Nolan*, 259 F.3d 209, 215 (4th Cir. 2001). With regard to the first requirement, we must accept as binding the interpretation of Maryland's long-arm statute rendered by the Maryland Court of Appeals. *See Mylan Labs.*, 2 F.3d at 61. The Maryland courts have consistently held that the state's long-arm statute is coextensive with the limits of personal jurisdiction set by the due process clause of the Constitution. *See Mohamed v. Michael*, 370 A.2d 551, 553 (Md. 1977). Thus, our statutory inquiry merges with our constitutional inquiry. *See Stover v. O'Connell Assocs., Inc.*, 84 F.3d 132, 135 (4th Cir. 1996).

A court's exercise of jurisdiction over a nonresident defendant comports with due process if the defendant has "minimum contacts" with the forum, such that to require the defendant to defend its interests in that state "does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted).

The standard for determining the existence of personal jurisdiction over a nonresident defendant varies, depending on whether the defendant's contacts with the forum state also provide the basis for the suit. If those contacts form the basis for the suit, they may establish "specific jurisdiction." In determining whether specific jurisdiction exists, we consider (1) the extent to which the defendant has purposefully availed itself of the privilege of conducting activities in the state; (2) whether the plaintiffs' claims arise out of those activities directed at the state; and (3) whether the exercise of personal jurisdiction would be constitutionally "reasonable." *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 711-12 (4th Cir. 2002), *cert. denied*, 123 S. Ct. 868 (2003); *see Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 & n.8 (1984). If, however, the defendant's contacts with the state are not also the basis for the suit, then jurisdiction over the defendant must arise from the defendant's general, more persistent, but unrelated contacts with the state. To establish general jurisdiction, the defendant's activities in the state must have been "continuous and systematic." *ALS Scan*, 293 F.3d at 712; *see Helicopteros*, 466 U.S. at 414 & n.9.

Because there is, in this case, no suggestion that CPC engaged in continuous and systematic activities within Maryland, our inquiry must focus on the conduct giving rise to the suit, i.e., CPC's alleged infringement of Carefirst's trademark. And accordingly, it is only if (1) CPC purposefully availed itself of the privilege of conducting activities in Maryland, (2) Carefirst's claims arise out of those activities, and (3) the exercise of personal jurisdiction would be constitutionally "reasonable," that CPC can be held subject to specific jurisdiction in Maryland. In conducting this inquiry, we direct our focus to "the quality and nature of [CPC's Maryland] contacts." *Nichols v. G.D. Searle & Co.*, 783 F. Supp. 233, 238 (D. Md. 1992), *aff'd*, 991 F.2d 1195 (4th Cir. 1993). We should not "merely . . . count the contacts and quantitatively compare this case to other preceding

cases." *Id.* Even a single contact may be sufficient to create jurisdiction when the cause of action arises out of that single contact, provided that the principle of "fair play and substantial justice" is not thereby offended. *Id.* (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477-78 (1985)); *see McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223-24 (1957).

B.

To decide whether the requisites of specific jurisdiction are satisfied in this case, it is necessary to consider how they apply to the particular circumstance in which, as here, an out-of-state defendant has acted outside of the forum in a manner that injures someone residing in the forum. In *Calder v. Jones*, 465 U.S. 783 (1984), the Supreme Court held that a court may exercise specific personal jurisdiction over a nonresident defendant acting outside of the forum when the defendant has intentionally directed his tortious conduct toward the forum state, knowing that that conduct would cause harm to a forum resident.[7] *Id.* at 789-90. Applying that test to the libel suit before it, the *Calder* Court held that California possessed jurisdiction over Florida reporters who had written an allegedly libelous article for the National Enquirer about a California actress, because "California [was] the focal point both of the story and of the harm suffered." *Id.* at 789. The writers' "actions were expressly aimed at California," the Court said, "[a]nd they knew that the brunt of [the potentially devastating] injury would be felt by [the actress] in the State in which she lives and works and in which the National Enquirer has its largest circulation." *Id.* at 789-90; *see also ESAB Group*, 126 F.3d at 625-26 (emphasizing importance, in light of *Calder*, of evidence that defendant expressly aimed or directed its conduct toward forum state and noting that business activities focusing "generally on customers

---

[7]This "effects test" of specific jurisdiction is typically construed to require that the plaintiff establish that: (1) the defendant committed an intentional tort; (2) the plaintiff felt the brunt of the harm in the forum, such that the forum can be said to be the focal point of the harm; and (3) the defendant expressly aimed his tortious conduct at the forum, such that the forum can be said to be the focal point of the tortious activity. *See, e.g.*, *IMO Indus., Inc. v. Keikert AG*, 155 F.3d 254, 265-66 (3d Cir. 1988).

located throughout the United States and Canada without focusing on and targeting" forum state cannot yield personal jurisdiction).

## C.

Carefirst contends that, in two distinct ways, CPC expressly aimed its trademark-infringing conduct at the forum state of Maryland: first, CPC set up a semi-interactive website that was accessible from Maryland; and second, CPC maintained a relationship with the Maryland web hosting company, NetImpact. We address in turn each of these two potential sources of specific jurisdiction.

## 1.

Carefirst first contends that it made a prima facie showing of specific personal jurisdiction when it alleged that CPC used an interactive website to direct electronic activity into the state with the manifest intent of conducting commercial activities with Maryland residents. That CPC possessed the requisite intent is, according to Carefirst, demonstrated by CPC's acceptance of donations from Maryland residents; its submission of e-mails to Maryland residents who make contributions; its mailing of promotional materials to Maryland residents who make contributions; and its establishment of a 24-hour toll-free telephone number and hotline over which Maryland residents could make donations, obtain counseling, or receive pregnancy test kits.

The issue before us is whether the evidence that Carefirst has proffered is sufficient to make out a prima facie case that CPC "expressly aimed" its allegedly unlawful online conduct at Maryland, so as to confer personal jurisdiction over CPC in the Maryland courts. To resolve this question, we begin with our recent decision in *ALS Scan, Inc. v. Digital Service Consultants, Inc.*, 293 F.3d 707, 713 (4th Cir. 2002), in which we addressed "whether a person electronically transmitting or enabling the transmission of information via the Internet to Maryland, causing injury there, subjects the person to the jurisdiction of a court in Maryland." *Id.* at 712. Or, to put the *ALS Scan* issue more broadly, when has "an out-of-state citizen, through electronic contacts, . . . 'entered' the State via the Internet for jurisdictional purposes"? *Id.* at 713.

In tackling these questions, our *ALS Scan* decision expressly "[a]dopt[ed] and adapt[ed]" the model for Internet-based specific jurisdiction developed in *Zippo Manufacturing Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997). *Id.* at 714. In its *Zippo* decision, Judge McLaughlin of the Western District of Pennsylvania first enunciated that court's influential "sliding scale" model for applying *Calder* principles to cases arising from electronic commerce. In *Zippo*, the defendant operated an online news service, which collected information and payments from, and contracted with, subscribers in the plaintiff's jurisdiction, all via the Internet. In holding that personal jurisdiction over the defendant was proper in the plaintiff's home state, the *Zippo* court distinguished among interactive, semi-interactive, and passive websites. When a defendant runs an interactive site, through which he "enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet," he can properly be haled into the courts of that foreign jurisdiction. *Zippo*, 952 F. Supp. at 1124. If, by contrast, the defendant's site is passive, in that it merely makes information available, the site cannot render him subject to specific personal jurisdiction in a foreign court. *Id.*; *see Mink v. AAAA Dev. LLC*, 190 F.3d 333, 336 (5th Cir. 1999); *see also ESAB Group, Inc. v. Centricut, LLC*, 34 F. Supp. 2d 323, 330 (D.S.C. 1999). Occupying a middle ground are semi-interactive websites, through which there have not occurred a high volume of transactions between the defendant and residents of the foreign jurisdiction, yet which do enable users to exchange information with the host computer. "In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs." *Zippo*, 952 F. Supp. at 1124.

Applying *Zippo*, we held in *ALS Scan* that, as a general matter, "[a] State may, consistent with due process, exercise judicial power over a person outside of the State when that person (1) directs electronic activity into the State, (2) with the manifested intent of engaging in business or other interactions within the State, and (3) that activity creates, in a person within the State, a potential cause of action cognizable in the State's courts." *Id.* at 714. Thus, "a person's action of placing information on the Internet" is not sufficient by itself to "subject[ ] that person to personal jurisdiction in each State in which the information is accessed." *Id.* at 712; *see also Panavision Int'l, L.P. v.*

*Toeppen*, 141 F.3d 1316, 1321 (9th Cir. 1998) (holding that something more than posting and accessibility is needed to "indicate that the [defendants] purposefully (albeit electronically) directed [their] activity in a substantial way to the forum state"). Applying this framework, we decided in *ALS Scan* that Maryland could not exercise personal jurisdiction over an Internet service provider whose activities in the state were merely "passive." And accordingly, we affirmed the dismissal of an underlying copyright action brought by the owner of copyrighted photographs against a nonresident Internet service provider for the website where the photographs were being displayed.

Since deciding *ALS Scan* last year, we have had only one occasion on which to discuss in detail and apply the principles of Internet-based personal jurisdiction that our *ALS Scan* opinion set forth. In *Young v. New Haven Advocate*, 315 F.3d 256 (4th Cir. 2002), we addressed whether a Virginia district court had personal jurisdiction over foreign defendants in a libel suit brought by the warden of a Virginia prison against two Connecticut newspapers. The warden's allegations stemmed from the newspapers' coverage of conditions in the prison, which housed numerous Connecticut prisoners. In their motion to dismiss for lack of personal jurisdiction, the newspapers pointed out that both publications were printed and distributed in Connecticut. One of the newspapers had no mail subscribers in Virginia, and the other had just eight. Neither solicited subscriptions from Virginia residents, and neither had officers or employees there. No one from either newspaper — not even the reporters — had traveled to Virginia to work on the articles. Two reporters made a few telephone calls into Virginia to gather information, but the newspapers otherwise had no direct contact with the Commonwealth.

In response, the warden noted that the newspapers posted the allegedly defamatory articles on Internet websites that were accessible to Virginia residents. He also observed that the newspapers' websites contained real estate, employment, and other advertising content, and he argued that such content was designed to target and attract out-of-staters, such as Virginians. Thus, the warden contended, the Virginia court possessed personal jurisdiction over the Connecticut defendants because (1) the newspapers, knowing that the warden was a Virginia resident, intentionally defamed him in their articles; (2) the newspapers posted the articles on Virginia-accessible websites that were

designed to attract an out-of-state audience; and (3) the primary effects of the defamatory statements on the warden's reputation were felt in Virginia. *Id.* at 261-62.

Despite the warden's showing of these Virginia connections, we held in *Young* that the Connecticut newspapers did not post materials on their Internet sites with the "manifest intent" of targeting readers in Virginia, and hence that a Virginia court lacked personal jurisdiction over the newspapers. *Id.* at 264. In rejecting the warden's argument and finding in favor of the defendant newspapers, Judge Michael reasoned that "[t]he [newspapers'] websites are not designed to attract or serve a Virginia audience." *Id.* at 263. Furthermore, "Connecticut, not Virginia, was the focal point of the [allegedly libelous] articles." *Id.* at 264. Because "[t]he newspapers did not post materials on the Internet with the manifest intent of targeting Virginia readers," they "could not have 'reasonably anticipate[d] being haled into [a Virginia] court.'" *Id.* (quoting *Calder*, 465 U.S. at 790).

Applying these precedents to this case, it is clear that, in order for CPC's website to bring CPC within the jurisdiction of the Maryland courts, the company must have done something more than merely place information on the Internet. *See ALS Scan*, 293 F.3d at 712. Rather, CPC must have acted with the "manifest intent" of targeting Marylanders. *See Young*, 315 F.3d at 264. Whether CPC intended to target Marylanders can be determined only from the character of the website at issue.

First, it is relevant that CPC's sites are "semi-interactive," in that they contain features that make it possible for a user to exchange information with the host computer. When a website is neither merely passive nor highly interactive, the exercise of jurisdiction is determined "by examining the level of interactivity and commercial nature of the exchange of information that occurs." *See Zippo*, 952 F. Supp. at 1126. While the *Zippo* defendant was "doing business over the Internet" with residents of the forum state, entering into contracts through its website with 3,000 individuals and seven Internet access providers in the forum state, *id.* at 1125-26, the only concrete evidence of online exchanges between CPC and Maryland residents was the single donation initiated by Carefirst's counsel (and ostensibly made to bolster the position of her client in this litigation).

Second, we find it pertinent that the overall content of CPC's website has a strongly local character, emphasizing that CPC's mission is to assist *Chicago-area* women in pregnancy crises. *See Young*, 315 F.3d at 263 ("The overall content of both [of the Connecticut newspapers'] websites is decidedly local."). Rather than target a Maryland audience, the website states that CPC is a non-profit organization that offers assistance "to more than 46,000 hurting women and families *in the Chicago area*"; that CPC "now operate[s] out of seven different locations *in the city [of Chicago] and [Chicago] suburbs*"; and that CPC "teaches abstinence until marriage in public high schools *throughout [Chicago's] Cook County*." In fact, the only respect in which CPC even arguably reaches out to Marylanders via its Internet website is in its generalized request that anyone, anywhere make a donation to support CPC's Chicago-based mission. Such a generalized request is, under the circumstances, an insufficient Maryland contact to sustain jurisdiction in that forum.

In advocating in favor of Maryland jurisdiction, Carefirst emphasizes that Maryland is the focal point of the injuries that it has suffered by virtue of CPC's infringement of its trademark. And indeed, it is true that, much as in *Young*, a substantial portion of the injuries that Carefirst has alleged were suffered in the forum state: just as the allegedly libeled warden in *Young* lived in Virginia, where that suit was filed, Carefirst's members reside in the mid-atlantic region, many of them in Maryland. However, as we said in *Young*, "[a]lthough the place that the plaintiff feels the alleged injury is plainly relevant to the [jurisdictional] inquiry, it must ultimately be accompanied by the defendant's own [sufficient minimum] contacts with the state if jurisdiction . . . is to be upheld." 315 F.3d at 262 (quoting *ESAB Group*, 126 F.3d at 626) (alterations in original); *see also ALS Scan*, 293 F.3d at 714. And, for the reasons discussed above, those minimum contacts are here lacking.

In sum, when CPC set up its generally accessible, semi-interactive Internet website, it did not thereby direct electronic activity into Maryland with the manifest intent of engaging in business or other interactions within that state in particular. *See ESAB Group*, 126 F.3d at 625-36 (holding that company's sales activities "focusing generally on customers located throughout the United States and Canada without focusing on and targeting" forum state do not yield personal juris-

diction); *see also Calder*, 465 U.S. at 789. Thus, while Maryland does have a strong interest in adjudicating disputes involving the alleged infringement of trademarks owned by resident corporations, and while we give due regard to Carefirst's choice to seek relief in that state, *see Kulko v. Sup. Ct. of Cal.*, 436 U.S. 84, 92 (1978), it nonetheless remains the case that CPC "could not [on the basis of its Internet activities] have 'reasonably anticipate[d] being haled into [a Maryland] court.'" *Young*, 315 F.3d at 264 (quoting *Calder*, 465 U.S. at 790). Consequently, the website fails to furnish a Maryland contact adequate to support personal jurisdiction over CPC in the Maryland courts.

2.

Carefirst next maintains that CPC's relationship with the in-forum web hosting company, NetImpact, is sufficient to ground specific jurisdiction. However, we have described as "de minimis" the level of contact created by the connection between an out-of-state defendant and a web server located within a forum. *Christian Sci.*, 259 F.3d at 217 n.9. And whereas in our *Christian Science* decision, we found jurisdiction proper on the basis that the in-state individual was involved in the "administration, maintenance, and upkeep" of the site, *id.*, NetImpact had no comparably active role with respect to CPC's site: NetImpact merely facilitated the purchase of CPC's domain names and rented CPC space on its servers — which in fact were located not in Maryland, but in Massachusetts. It is unreasonable to expect that, merely by utilizing servers owned by a Maryland-based company, CPC should have foreseen that it could be haled into a Maryland court and held to account for the contents of its website. Consequently, CPC's employment of NetImpact as a web host does not ground specific jurisdiction over CPC in Maryland.

3.

In sum, given the limited contacts between CPC and Maryland, to require CPC to defend its interests in that state would "offend traditional notions of fair play and substantial justice." *Int'l Shoe*, 326 U.S. at 316 (internal quotation marks omitted). The evidence that CPC expressly aimed or directed its conduct toward Maryland consists of (1) CPC's semi-interactive, Maryland-accessible Internet website,

which contained CPC's allegedly infringing use of the CAREFIRST name; and (2) CPC's contract with the Maryland web hosting company, NetImpact, which enabled CPC to launch the allegedly infringing website. For the reasons spelled out above, this evidence is insufficient to make out a prima facie case of specific jurisdiction.

V.

Carefirst next contends that, even if it did not make a prima facie showing of personal jurisdiction, the district court abused its discretion in refusing to permit jursidictional discovery. In denying Carefirst's motion for discovery, the court explained that, "in light of CPC's specific affidavits and the lack of any concrete proffer by [Carefirst],"[8] Carefirst had not demonstrated that it was entitled to discovery. Opinion at 2. And in response to Carefirst's subsequent renewal of its discovery request on a motion to vacate the dismissal, the court found that Carefirst had "failed to establish any fraud or intentional misconduct on the part of [CPC]," and that the "additional information [that Carefirst sought] concerning [NetImpact] would not alter [the] analysis of personal jurisdiction." July Order at 1.

Discovery under the Federal Rules of Civil Procedure is broad in scope and freely permitted. *Mylan Labs.*, 2 F.3d at 64. At the same time, however, district courts "have broad discretion in [their] resolution of discovery problems that arise in cases pending before [them]." *Id.* (quoting *In re Multi-Piece Rim Prods. Liab. Litig.*, 653 F.2d 671, 679 (D.C. Cir. 1981)) (alterations in original). When a plaintiff offers only speculation or conclusory assertions about contacts with a forum state, a court is within its discretion in denying jurisdictional discovery. *See McLaughlin v. McPhail*, 707 F.2d 800, 806 (4th Cir. 1983) (holding that district court did not abuse its discretion in denying jurisdictional discovery when, "[a]gainst the defendants' affidavits," plaintiff "offered nothing beyond his bare allegations that the defendants had had significant contacts with the [forum] state of Maryland"

---

[8]The Opinion refers to "the lack of any concrete proffer by the defendant." Opinion at 2. Of course, Carefirst is the plaintiff, not the defendant. However, the accompanying Order makes it clear that the Opinion's reference to the "defendant" is merely a typographical error, and that the court intended "plaintiff" rather than "defendant."

(internal quotation marks omitted)); *ALS Scan*, 293 F.3d at 716 n.3 (upholding district court's refusal to allow plaintiff to engage in jurisdictional discovery where plaintiff's request was based on "conclusory assertions"); *see also Rich v. KIS Cal., Inc.*, 121 F.R.D. 254, 259 (M.D.N.C. 1988) ("[W]here a plaintiff's claim of personal jurisdiction appears to be both attenuated and based on bare allegations in the face of specific denials made by defendants, the Court need not permit even limited discovery confined to issues of personal jurisdiction should it conclude that such discovery will be a fishing expedition."). Having found a "lack of any concrete proffer by [Carefirst]," no indication of "fraud or intentional misconduct on the part of [CPC]" in its jurisdiction affidavits, and no reason to believe that the "additional information [that Carefirst sought] concerning [NetImpact] would . . . alter [the] analysis of personal jurisdiction," the court was within its discretion in deciding that Carefirst had failed to establish that jurisdictional discovery was warranted.[9]

## VI.

For the foregoing reasons, the judgment of the district court is affirmed.

*AFFIRMED*

---

[9]Carefirst also asserts that the district court abused its discretion in denying its request for additional time in which to file a response to CPC's motion to dismiss, maintaining that the request was made in good faith and would not have caused significant delay or prejudice to CPC. The district court, however, found that such an extension would be fruitless. Order at 2. That finding is not clearly erroneous, and the court was within its discretion in denying the motion on that basis. We thus affirm the denial.