878 A.2d 567

**BEYOND SYSTEMS, INC.**

v.

**REALTIME GAMING HOLDING COMPANY, LLC, et al.**

No. 119, Sept. Term, 2004.

Court of Appeals of Maryland.

June 22, 2005.

Reconsideration Denied Aug. 8, 2005.

2

**4**

Stephen H. Ring (Stephen H. Ring, P.C., Gaithersburg, on brief), for Appellant.

Sanford M. Saunders, Jr. (Kenneth P. Kaplan, Greenberg Traurig, LLP, Washington, DC), on brief for Appellees.

Argued Before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

BATTAGLIA, Judge.

This case arises out of a civil suit premised upon Section 14–3002 of the Commercial Law Article of the Maryland Code, which prohibits conspiring to disseminate unauthorized, false,

or misleading information via electronic mail ("e-mail"). Because we determine that Petitioner, Beyond Systems, Inc. ("BSI"), did not establish a *prima facie* case that Respondents, KDMS International, LLC ("KDMS") and Realtime Gaming Holding Company, LLC ("Realtime Gaming"), possess the requisite minimum contacts amounting to purposefully availing themselves of the benefits of conducting business in Maryland, we agree with the Circuit Court's ruling that the court lacked personal jurisdiction over Respondents. Moreover, we conclude that the Circuit Court did not abuse its discretion by denying Petitioner discovery on the personal jurisdiction issue and striking the amended complaint.

## Background

KDMS, a business that develops interactive [1] proprietary software [2] used in the online gaming industry, is a limited liability company ("LLC") formed under the laws of the State of Delaware, with its principal place of business in Atlanta, Georgia. Realtime Gaming, the holding company for KDMS, is a limited liability company formed under the laws of the State of Georgia with its principal place of business in Atlanta, Georgia. The two businesses share the same President and Chief Executive Officer, Michael Staw.

As part of Realtime Gaming's sales and marketing strategy for the KDMS software, Realtime Gaming entered into an exclusive licensing agreement with Montana Overseas, a Panamanian corporation, by which Montana Overseas would be responsible for issuing licenses for the use of KDMS's soft-

---

1. Interactive is defined as "a two-way electronic communication system ... that involves a user's orders ... or responses." Merriam–Webster Dictionary, "interactive" (10th ed.2002).

2. Proprietary software is "[s]oftware that cannot be used, redistributed, or modified without permission. Proprietary software is usually sold for profit, consists only of machine-readable code, and carries a limited license that restricts copying, modification, and redistribution. A user may usually make a backup copy for personal use; but if the software is sold or given away, any backup copies must be passed on to the new user or destroyed." BLACK'S LAW DICTIONARY, "proprietary software" (8th ed.2004).

ware. Through the licensing process with Montana Overseas, windowscasino.com, which is owned by ADLM Ltd. based in St. Helier, Jersey, United Kingdom, obtained the right to use the KDMS software in its online casino. Windowscasino.com is an interactive online casino that promotes only the games designed by KDMS.

In March of 2003, Travis Thom, a resident of Albuquerque, New Mexico, found an advertisement on the Internet for "www.windowscasino.com." The advertisement explained how individuals could become "affiliates" of windowscasino.com for a small investment and make money by referring players to windowscasino.com's website. During the first two weeks of March, Thom contacted windowscasino.com by telephone and spoke to a sales associate for windowscasino.com about becoming an "affiliate." The employee described the relationship with windowscasino.com and informed Thom that he would have to purchase a "Casino–To–Go Private Label Package" for $999.00 plus applicable taxes.

Around March 14, 2003, Thom visited the www.windowscasino.com website and completed an "affiliate" application to make the purchase, which was confirmed the next day by a windowscasino.com employee through e-mail. Upon receipt of the "Casino–To–Go Private Label Package," Thom created a name for his affiliate webpage, www.goldenrhinocasino.com, which he registered in his own name with Yahoo! Domains,[3] a service that registers names of websites. Windowscasino.com then designed Thom's webpage, with his input regarding the aesthetics, but not the content or function. Thom's webpage directed players to the windowscasino.com website where gamblers downloaded the software designed by KDMS, which was retrieved from an IP address (Internet Protocol address)

---

**3.** "Domain names serve as a primary identifier of an Internet user." *Zippo Manufacturing Co. v. Zippo Dot Com Inc.,* 952 F.Supp. 1119, 1121 n. 1 (W.D.Pa.1997), citing *Panavision Intern., L.P. v. Toeppen,* 938 F.Supp. 616 (C.D.Cal.1996). "Businesses using the Internet commonly use their business names as part of the domain name (e.g.IBM.com)." *Id.* "The designation '.com' identifies the user as a commercial entity." *Id.*

registered to KDMS. In return for directing individuals to windowscasino.com, Thom would be compensated with 45% of referred players' losses and up to a $40.00 "bounty" per player who deposited funds to gamble at windowscasino.com.

On April 14, 2003, Thom contracted with a bulk e-mail solicitation service, Omega One Media, Inc., to send 2.5 million unsolicited e-mail advertisements.[4] He paid windowscasino.com an additional fee to write and design the e-mails. On April 26, 2003, sixteen e-mail addresses used by employees of BSI each received fifteen such unsolicited commercial e-mails over a twenty-four hour period, for a total of 240 e-mails, advertising the Golden Rhino Casino.

On December 31, 2003, BSI filed a complaint against Realtime Gaming, KDMS, and an unknown co-defendant in the Circuit Court for Montgomery County and alleged violations of Maryland Code (2002, 2004 Cum.Supp.), Section 14–3002 of the Commercial Law Article.[5] On April 16, 2004, Realtime

---

4. Omega One Media, Inc. is not related to any of the entities named in the present action and is not named in this lawsuit.

5. Section 14–3002 of the Commercial Law Article provides:
 (a) *Application.*—This section does not apply to an interactive computer service provider or a telecommunication utility to the extent that the interactive computer service provider or telecommunication utility merely handles, retransmits, or carries a transmission of commercial electronic mail.
 (b) *Prohibition.*—A person may not initiate the transmission, conspire with another person to initiate the transmission, or assist in the transmission of commercial electronic mail that:
 (1) Is from a computer in the State or is sent to an electronic mail address that the sender knows or should have known is held by a resident of the State; and
 (2)(i) Uses a third party's Internet domain name or electronic mail address without the permission of the third party;
 (ii) Contains false or misleading information about the origin or the transmission path of the commercial electronic mail; or
 (iii) Contains false or misleading information in the subject line that has the capacity, tendency, or effect of deceiving the recipient.
 (c) *Presumption.*—A person is presumed to know that the intended recipient of commercial electronic mail is a resident of the State if the information is available on request from the registrant of the Internet domain name contained in the recipient's electronic mail address.

Gaming and KDMS filed a motion to dismiss the complaint for lack of personal jurisdiction, or in the alternative a motion for summary judgment. In support of their motion, Realtime Gaming and KDMS attached an affidavit from their mutual President and CEO, Michael Staw ("Staw") who asserted that Realtime Gaming functions solely as a holding company for KDMS and does not engage in any other business activities, and that KDMS has conducted no business in Maryland. BSI filed a memorandum in opposition to Realtime Gaming and KDMS's motion and attached a supporting affidavit from BSI's owner, Paul Wagner ("Wagner"), in which he asserts various conclusory statements concerning the existence of an agency relationship between Realtime Gaming, KDMS, and windowscasino.com.[6] On May 21, 2004, Realtime Gaming and KDMS filed a reply memorandum, attempting to refute BSI's allegations.

On May 26, 2004, the Circuit Court held a hearing and, at the hearing's close, stated its intention to dismiss the complaint for lack of personal jurisdiction. On June 2, 2004, the court issued a written order that dismissed BSI's complaint for lack of personal jurisdiction over Realtime Gaming and KDMS and did not specify that BSI would have leave to amend the complaint.[7] On June 11, 2004, BSI filed a motion

---

(d) *Blocking.*—An interactive computer service provider:

(1) May block the receipt or transmission through its interactive computer service of commercial electronic mail that it reasonably believes is or will be sent in apparent violation of this section; and

(2) May not be held liable for an action under item (1) if this subsection that is voluntarily taken in good faith.

Md.Code (2002, 2004 Cum.Supp.), § 14–3002 of the Commercial Law Article.

6. In his affidavit, Wagner asserts that a significant relationship exists among Realtime Gaming and KDMS and "affiliates" in which "the principal merchants (and alter egos) ... employ affiliates to spamvertise their products," and the two companies "pay[ ] affiliates to advertise KDMS's proprietary software to potential players." Throughout his affidavit, Wagner characterizes, without support, windowscasino.com and Realtime Gaming and KDMS as interchangeable entities.

7. Because the oral statement of dismissal contemplated the written order, which was later issued by the trial court, it is the date of the

for reconsideration with an amended complaint attached. In the amended complaint, BSI made specific allegations regarding the connection between Realtime Gaming, KDMS, windowscasino.com, and Thom through a server and IP address registered to KDMS. It also alleged a significant relationship among Realtime Gaming, KDMS, and a network of sub-licensees, one of which assisted in the transmission of the e-mails at issue. Moreover, it named Travis Thom as an additional defendant who caused the e-mails in question to be sent.

Realtime Gaming and KDMS, in turn, filed a motion opposing BSI's motion for reconsideration and seeking to have the amended complaint stricken. In so doing, Realtime Gaming and KDMS asserted that BSI offered no new facts that would establish personal jurisdiction over them. On September 21, 2004, the Circuit Court denied BSI's motion for reconsideration and granted the motion to strike the amended complaint.

On October 20, 2004, BSI filed its notice of appeal.[8] Prior to any proceedings in the Court of Special Appeals, BSI, on

---

issuance of the written order that constitutes the date of the final appealable judgment. *See Walbert v. Walbert,* 310 Md. 657, 661, 531 A.2d 291, 293 (1987). The Circuit Court failed to dismiss "John Doe" from the suit. Because "John Doe," although named as a defendant in the complaint, was never served with process and was never identified as a real person, "John Doe" is not a party to the action and the Circuit Court's failure to dismiss him from the suit does not prevent the judgment from being final. *See, e.g., Jones v. Mid–Atlantic Funding Co.,* 362 Md. 661, 665 n. 2, 766 A.2d 617, 618 n. 2 (2001) (noting that defendant named in the complaint was not a party to the action because he was never served); *Md. Bd. of Nursing v. Nechay,* 347 Md. 396, 406, 701 A.2d 405, 410 (1997) (stating that the court lacks jurisdiction over a named defendant if "process" has not been served); *Claibourne v. Willis,* 347 Md. 684, 686–87, 702 A.2d 293, 297 (1997) (same). Subsequently, BSI filed a motion in Circuit Court to dismiss "John Doe" from the case. Although we do not know whether the Circuit Court dismissed "John Doe," because he was never served, is not a party, and does not represent a real person, we do not address any filings made after the writ of certiorari was issued.

8. Because BSI filed its Motion for Reconsideration under Rule 2–534, which governs motions to alter or amend judgment, within the ten-day period specified in the Rules, the judgment dismissing the complaint

November 22, 2004, filed a petition for writ of certiorari containing the following questions:

1. Did the trial court err in dismissing Petitioner's claims against Respondents under the Maryland anti-spam statute, § 14–3001 et seq. of the Commercial Law Article of the Annotated Code of Maryland, for initiating, conspiring to initiate, or assisting in the transmission of 240 e-mails advertising Respondents' business, for lack of personal jurisdiction?

2. Did the trial court err in denying Petitioner's request to take discovery as to the nature and extent of Respondents' contacts with Maryland for purposes of personal jurisdiction under the facts described above?

3. Did the trial court err in striking the amended complaint containing detailed allegations of fact, including facts relevant to the issue of personal jurisdiction?

On December 17, 2004, we granted the petition and issued the writ. *Beyond Systems, Inc. v. Realtime Gaming Holding Company, LLC*, 384 Md. 448, 863 A.2d 997 (2004).[9] Because

---

lost its finality for appeal purposes. *See Popham v. State Farm Mut. Ins. Co.*, 333 Md. 136, 143, 634 A.2d 28, 31–32 (1994); *Unnamed Att'y v. Attorney Grievance Comm'n*, 303 Md. 473, 486, 494 A.2d 940, 946 (1985).

Rule 8–202, governing the proper time for filing notice of appeal, provides in pertinent part:

In a civil action, when a timely motion is filed pursuant to Rule . . . 2–534, the notice of appeal shall be filed within 30 days after entry of (1) a notice withdrawing the motion or (2) an order denying a motion pursuant to Rule 2–533 or disposing of a motion pursuant to Rule 2–532 or 2–534.

In the present case, the court denied the motion for reconsideration on September 21, 2004 and BSI filed its notice of appeal to the Court of Special Appeals on October 20, 2004, within the 30–day period set forth in Rule 8–202. Therefore, we have jurisdiction to hear the appeal.

9. Prior to argument in this Court, on April 18, 2005, BSI filed a motion to supplement the record under Maryland Rule 8–414, which Realtime Gaming and KDMS opposed as an impermissible motion to introduce evidence that was not presented below. Maryland Rule 8–414 permits the Court, upon the motion of a party or *sua sponte*, to "order that an error or omission in the record be corrected." Md. Rule 8–414. In its motion, BSI seeks to introduce additional pages from the Internet,

we concur with the trial court's determination that BSI has failed to make a *prima facie* showing of personal jurisdiction by a preponderance of the evidence, we hold that the Circuit Court properly determined that the action could not proceed to trial. Moreover, we determine that the Circuit Court did not abuse its discretion in denying BSI's request for discovery.

### Standard of Review

The trial court dismissed BSI's complaint for lack of personal jurisdiction over Realtime Gaming and KDMS under Maryland Rule 2–322(a) and (c), which state in pertinent part:

(a) **Mandatory.** The following defenses shall be made by motion to dismiss filed before the answer, if an answer is required: (1) lack of jurisdiction over the person, (2) improper venue, (3) insufficiency of process, and (4) insufficiency of service of process. If not so made and the answer is filed, these defenses are waived.

\* \* \*

(c) **Disposition.** If, on a motion to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 2–501, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 2–501.

Md. Rule 2–322(a) and (c).

As Judge Paul V. Niemeyer notes in his Maryland Rules Commentary, Third Edition, all of the defenses listed in Maryland Rule 2–322(a) are collateral to the merits and raise

which were not presented to the court below, to further bolster its allegations concerning the relationship between Realtime Gaming, KDMS, and windowscasino.com. Because the evidence at issue was not erroneously omitted from the record transmitted from the Circuit Court, and BSI does not seek to correct any error contained in the record, its motion to supplement is denied.

questions of law. Judge Paul V. Niemeyer and Linda Shuett, *MARYLAND RULES COMMENTARY, THIRD EDITION* 205 (2003). If facts are necessary in deciding the motion, the court may consider affidavits or other evidence adduced during an evidentiary hearing. *Id.*[10]

## Discussion

BSI argues that it has made a *prima facie* showing of minimum contacts with Maryland that is sufficient to defeat a motion to dismiss for lack of personal jurisdiction. To that end, BSI notes that it received 240 e-mails from an individual promoting goldenrhinocasino.com, a website that contained links to download KDMS's software from an IP address assigned to KDMS, which corresponds to a server owned by KDMS and Realtime Gaming. BSI notes that the same IP address and server are also promoted on the windowscasino.com website, which powered the goldenrhinocasino.com web page. From these allegations, and windowscasino.com's involvement in the design of the goldenrhinocasino.com website and the e-mails, BSI concludes that Realtime Gaming and KDMS are directly involved in running windowscasino.com, and therefore, were involved in the transmission of the e-mails in question. Thus, BSI asserts that it has satisfied the *prima facie* showing required for the Circuit Court to properly exercise personal jurisdiction over Realtime Gaming and KDMS pursuant to *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir.1989).

BSI further argues that the trial court abused its discretion by denying it discovery concerning personal jurisdiction. According to BSI, the jurisdictional issue is inextricably inter-

---

**10.** This contrasts with the effect of the trial court's consideration of matters outside the pleadings on a motion to dismiss for failure to state a claim upon which relief may be granted under Maryland Rule 2–322(b). Rule 2–322 provides that if the trial court grants a motion to dismiss for failure to state a claim upon which relief may be granted after considering evidence outside the four corners of the complaint, we view the motion as having converted into one of summary judgment for review purposes. *See Green v. H & R Block, Inc.*, 355 Md. 488, 501, 735 A.2d 1039, 1047 (1999).

twined with the merits of the case, and therefore, the court should have permitted the action to proceed with discovery. BSI states that to do otherwise is inequitable.

Finally, BSI asserts that the trial court abused its discretion in striking the amended complaint because the facts alleged therein and supporting materials showed that Realtime Gaming and KDMS had sufficient contacts with Maryland to support personal jurisdiction. BSI contends that permitting the amended complaint to stand would not have prejudiced Realtime Gaming or KDMS, and that the court ignored the principle that leave to amend generally should be granted.

Conversely, Realtime Gaming and KDMS argue that BSI has not demonstrated a *prima facie* case of specific personal jurisdiction or general personal jurisdiction. Realtime Gaming and KDMS assert that BSI has not pointed to any evidence showing an agency or subsidiary relationship between them and windowscasino.com or Travis Thom, the individual who arranged for the e-mails to be sent. Moreover, Realtime Gaming and KDMS contend that neither company has any contacts with the State of Maryland, *i.e.*, are not incorporated in Maryland, do not conduct business in Maryland, and were not involved in the transmission of the e-mails at issue, and as such, are not subject to specific or general personal jurisdiction.

Realtime Gaming and KDMS also argue that the trial court did not abuse its discretion when it denied BSI's request for discovery. They assert that BSI provided no basis upon which to grant discovery beyond conclusory allegations and bald-faced assertions of jurisdiction. Ultimately, Realtime Gaming and KDMS characterize BSI's desire for discovery as a fishing expedition.

Finally, in response to BSI's arguments concerning the striking of the amended complaint, Realtime Gaming and KDMS contend that the trial court did not abuse its discretion when it denied BSI's request for leave to amend. They argue that the trial judge properly exercised his discretion because the amended complaint was based on facts that were already

before the court, and therefore, could not cure the fatal defects in BSI's action.

## Conditions for Personal Jurisdiction

■ Whether a court may exert personal jurisdiction over a foreign defendant entails dual considerations. First, we consider whether the exercise of jurisdiction is authorized under Maryland's long arm statute, Md.Code (1973, 2002 Repl.Vol.), § 6–103 of the Courts and Judicial Proceedings Article.[11] *See*

---

11. Md.Code (1973, 2002 Repl.Vol.), Section 6–103 of the Courts and Judicial Proceedings Article provides:

(a) *Condition.*—If jurisdiction over a person is based solely upon this section, he may be sued only on a cause of action arising from any act enumerated in this section.

(b) *In general.*—A court may exercise personal jurisdiction over a person, who directly or by an agent:

(1) Transacts any business or performs any character of work or service in the State;

(2) Contracts to supply goods, food, services, or manufactured products in the State;

(3) Causes tortious injury in the State by an act or omission in the State;

(4) Causes tortious injury in the State or outside the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from goods, food, services, or manufactured products used or consumed in the State;

(5) Has an interest in, uses, or possesses real property in the State; or

(6) Contracts to insure or act as a surety for, or on, any person, property, risk, contract, obligation, or agreement located, executed, or to be performed within the State at the time the contract is made, unless the parties otherwise provide in writing.

(c) *Applicability to computer information and computer programs.*— (1)(i) in this subsection the following terms have the meanings indicated.

(ii) "Computer information" has the meaning stated in § 22–102 of the Commercial Law Article.

(iii) "Computer program" has the meaning stated in § 22–102 of the Commercial Law Article.

(2) The provisions of this section apply to computer information and computer programs in the same manner as they apply to goods and services.

Maryland Code (2002, 2004 Cum.Supp.), Section 22–102(10) of the Commercial Law Article provides:

"Computer information" means information in electronic form which is obtained from or through the use of a computer or which is in a

*Lamprecht v. Piper Aircraft Corp.*, 262 Md. 126, 130, 277 A.2d 272, 275 (1971); *Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc.*, 334 F.3d 390, 396 (4th Cir.2003); *Christian Sci. Bd. of Dirs. of the First Church of Christ v. Nolan*, 259 F.3d 209, 215 (4th Cir.2001). Our second task is to determine whether the exercise of jurisdiction comports with due process requirements of the Fourteenth Amendment. *Lamprecht*, 262 Md. at 130, 277 A.2d at 275; *Carefirst*, 334 F.3d at 396; *Christian Sci. Bd. of Dirs.*, 259 F.3d at 215. We have consistently held that the purview of the long arm statute is coextensive with the limits of personal jurisdiction set by the due process clause of the Federal Constitution. *See e.g.*, *Mohamed v. Michael*, 279 Md. 653, 657, 370 A.2d 551, 553 (1977); *Geelhoed v. Jensen*, 277 Md. 220, 224, 352 A.2d 818, 821 (1976); *Lamprecht*, 262 Md. at 130, 277 A.2d at 275.

■ BSI alleges that the e-mails at issue in the present case violate the Maryland Commercial Electronic Mail Act ("MCEMA"), Md.Code (2002, 2004 Cum.Supp.), §§ 14–3001 to 14–3003 of the Commercial Law Article, which provides for a private cause of action to seek redress for tortious injury arising from the receipt of misleading or fraudulent, unsolicited, commercial e-mail. Section 14–3002 provides in pertinent part:

(b) *Prohibition.*—A person may not initiate the transmission, conspire with another person to initiate the transmission, or assist in the transmission of commercial electronic mail that:

(1) Is from a computer in the State or is sent to an electronic mail address that the sender knows or should have known is held by a resident of the State; and

---

form capable of being processes by a computer. The term includes a copy of the information and any documentation or packaging associated with the copy.

Maryland Code (2002, 2004 Cum.Supp.), Section 22–102(12) of the Commercial Law Article provides:

"Computer program" means a set of statements or instructions to be used directly or indirectly in a computer to bring about a certain result. The term does not include separately identifiable informational content.

(2)(i) Uses a third part's Internet domain name or electronic mail address without the permission of the third party;

(ii) Contains false or misleading information about the origin or the transmission path of the commercial electronic mail; or

(iii) Contains false or misleading information in the subject line that has the capacity, tendency, or effect of deceiving the recipient.

Md.Code (2002, 2004 Cum Supp.), § 14–3002 if the Commercial Law Article. This statute was enacted in 2002 by the General Assembly in an effort to curb the dissemination of false or misleading information through unsolicited, commercial e-mail, as a deceptive business practice. Economic Matters Committee, Fl. Rpt., HB 915, at 2. At the time of the statute's enactment, twenty-one other states had already enacted some form of statutory scheme to address the proliferation of "spam." [12] *See* Spam Laws: Summary, Bill File, HB 915. Thus, BSI asserts that the e-mails and their content

---

**12.** As the Washington Supreme Court noted in *State v. Heckel*, 143 Wash.2d 824, 24 P.3d 404, 406 n. 1 (2001):

The term 'spam' refers broadly to unsolicited bulk e-mail (or 'junk e-mail'), which 'can be either commercial (such as an advertisement) or noncommercial (such as a joke or chain letter).' Sabra Anne Kelin, *State Regulation of Unsolicited Commercial E–Mail*, 16 Berkeley Tech. L.J. 435, 436 & n. 10 (2001). Use of the term "spam" as Internet jargon for this seemingly ubiquitous junk e-mail arose out of a skit by the British comedy troupe Monty Python, in which a waitress can offer a patron no single menu item that does not include spam: 'Well, there's spam, egg, sausage and spam. That's not got *much* spam in it.' 2 Graham Chapman et al., *The Complete Monty Python's Flying Circus: All the Words* 27 (Pantheon Books 1989). Hormel Foods Corporation, which debuted its SPAM® luncheon meat in 1937, has dropped any defensiveness about this use of the term and now celebrates its product with a website (www.spam.com). *See Hormel Objects to Cyber Promotions' Use of 'SPAM' Mark*, 4 No. 1 Andrews Intell. Prop. Litig. Rep. 19 (1997); Laurie J. Flynn, Gracious Concession on Internet 'Spam,' N.Y. Times, Aug. 17, 1998, at D3. Because the term has been widely adopted by Internet users, legislators, and legal commentators, we use the term herein, along with its useful derivatives 'spammer' and 'spamming.'

provide the basis for the trial court to assert personal jurisdiction through the long arm statute.

The Maryland long arm statute, Md.Code (1973, 2002 Repl. Supp.), Section 6–103 of the Courts and Judicial Proceedings Article, was first enacted in 1964 in response to the Supreme Court's decision in *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).[13] This statute, codified as Maryland Code (1957, 1964 Cum.Supp.), Article 75 Section 96, provided:

(a) A court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a cause of action arising from the person's

(1) transacting any business in this State;

(2) contracting to supply services in this State;

(3) causing tortious injury in this State by an act or omission in this State;

(4) causing tortious injury in this State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in this State or derives substantial revenue from food or services used or consumed in this State;

(5) having an interest in, using, or possessing real property in this State; [or]

(6) contracting to insure any person, property, or risk located within this State at the time of contracting;

(b) When jurisdiction over a person is based solely on this section.

---

**13.** Prior to *Int'l Shoe,* the Supreme Court's opinion in *Pennoyer v. Neff,* 95 U.S. 714, 24 L.Ed. 565 (1877), provided that due process required service of process on an individual defendant while present within the state for a valid personal judgment. A corporation only existed within the borders of the state of its incorporation, *see Bank of Augusta v. Earle,* 38 U.S. 519, 10 L.Ed. 274 (1839), and states had no jurisdiction over foreign corporations. Bernard Auerbach, *The "Long Arm" Comes to Maryland,* 26 Md. L.Rev. 13, 14 (1966).

In 1965, the Section was amended to add language to subsection (b) that had been omitted inadvertently, *see* 1965 Md. Laws, Chap. 749, so that subsection (b) read:

> (b) When jurisdiction over a person is based solely upon this section, only a cause of action arising from acts enumerated in this section may be asserted against him.

Md.Code (1957, 1965 Cum.Supp.), Art 75 § 96(b). In 1968, subsection (a)(6) was amended to state:

> (a)(6) contracting to insure or act as a surety for, or on, any person, property, or risk, contract, obligation, or agreement located, executed or to be performed within this State at the time of contracting, unless the parties otherwise provide in writing.

Md.Code (1957, 1968 Repl.Vol.), Art. 75 § 96(a)(6). As part of the recodification effort, in 1973, the General Assembly revised this Section and renumbered it as Section 6–103 of the Courts and Judicial Proceedings Article:

> (a) *Condition.* If jurisdiction over a person is based solely upon this section, he may only be sued on a cause of action arising from any act enumerated in this section.

> (b) *In general.* A court may exercise personal jurisdiction over a person, who directly or by an agent:

> > (1) transacts any business or performs any character of work or services in this State;

> > (2) contracts to supply goods, food, services, or manufactured products in the State;

> > (3) causing tortious injury in this State by an act or omission in this State;

> > (4) causes tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from goods, food, services, or manufactured products used or consumed in the State;

> > (5) has an interest in, uses, or possesses real property in the State; or

(6) Contracts to insure or act as a surety for, or on, any person, property, risk, contract. obligation, or agreement located, executed, or to be performed within the State at the time the contract is made, unless the parties otherwise provide in writing.

Md.Code (1973), § 6–103 of the Courts and Judicial Proceedings Article. According to the commentary published with the statute, the long arm statute was intended to give Maryland courts jurisdiction to the full extent permitted by the Federal Constitution. 1973 Md. Laws, 1st Sp. Sess., Chap. 2 § 1.

In 2000, the General Assembly amended the long arm statute for the final time with the Maryland Uniform Computer Information Transactions Act and added current subsection (c) to expand the courts' jurisdiction over "computer information" and "computer programs." 2000 Md. Laws, Chap. 11 ("specifying that provisions of law granting jurisdiction over a person in a cause of action include certain computer information and computer information transactions"). Current subsection (c) of the long arm statute provides:

(c) *Applicability to computer information and computer programs.*—(1)(i) In this subsection the following terms have the meanings indicated.

(ii) "Computer information" has the meaning stated in § 22–102 of the Commercial Law Article.

(iii) "Computer program" has the meaning stated in § 22–102 of the Commercial Law Article.

(2) The provisions of this section apply to computer information and computer programs in the same manner as they apply to goods and services.

Md.Code (1973, 2002 Repl.Vol.), § 6–103(c) of the Courts and Judicial Proceedings Article. "Computer information" and "computer program" are defined as follows under the Maryland Code:

(10) "Computer information" means information in electronic form which is obtained from or through the use of a computer or which is in a form capable of being processed by a computer. The term includes a copy of the information

and any documentation or packaging associated with the copy.

* * *

(12) "Computer program" means a set of statements or instructions to be used directly or indirectly in a computer to bring about a certain result. The term does not include separately identifiable informational content.

Md.Code (2004 Cum.Supp.), §§ 22–102(10) and (12) of the Commercial Law Article.

■ Although e-mails brought the present case to court, the gravamen of the personal jurisdiction issue for the purposes of the long arm statute arise out of advertisements for licensed proprietary software for use on computers, which require the user·to download the program from a remote source. The software at issue "consists only of machine-readable code" to execute a certain action on the user's computer. BLACK'S LAW DICTIONARY, "proprietary software" (8th ed.2004). Thus, conducting business in Maryland that involves supplying computer programs or information to Maryland residents will be treated in the same manner as if the programs and information were tangible goods or services provided by a business. Advertising the software at issue may form the basis of personal jurisdiction under the Maryland long arm statute based upon the definition of "computer program." Before we explore the issue of whether the minimum contacts test has been met, however, a discussion of the characteristics of the Internet is warranted.

### The Internet

In *Reno v. American Civil Liberties Union*, 521 U.S. 844, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997), the Supreme Court provided its explanation of the Internet as:

an international network of interconnected computers. It is the outgrowth of what began in 1969 as a military program called "ARPANET," [an acronym for the network developed by the Advanced Research Project Agency] which was

designed to enable computers operated by the military, defense contractors, and universities conducting defense-related research to communicate with one another by redundant channels even if some portions of the network were damaged in a war.

While the ARPANET no longer exists, it provided an example for the development of a number of civilian networks that, eventually linking with each other, now enable tens of millions of people to communicate with one another and to access vast amounts of information from around the world.

*Id.* at 849–50, 117 S.Ct. at 2334, 138 L.Ed.2d at 884.

Because the Internet is a global network of computers, "each computer connected to the Internet must have a unique address," Rus Shuler, How Does the Internet Work? (Whitepaper 2002),[14] known as an Internet Protocol Address, which "can be used to identify the source of the connection" to the Internet. *United States v. Bach,* 400 F.3d 622, 625 n. 4 (8th Cir.2005).

When connected to the Internet, computers communicate with each other through the use of a "protocol[15] stack," which is usually the "TCP/IP protocol stack." For example, when someone is sending an e-mail, the e-mail message enters through the Application Protocols Layer, which corresponds to specific programs such as browsers for using the World Wide Web and e-mail. The message then enters the Transmission Control Protocol ("TCP"), which directs certain information to a specific application or program on a computer using a port. From the TCP layer of the protocol stack, the message then moves into the Internet Protocol Layer, which directs the message to a specific computer using an IP address. The final step in the process prior to entering the Internet is for

---

**14.** The information concerning the structure of the Internet that follows is taken from How Does the Internet Work? unless otherwise cited.

**15.** "Protocol" is "a set of conventions governing the treatment and especially the formatting of data in an electronic communications system." Merriam–Webster Dictionary, "protocol" (10th ed.2002).

the Hardware Layer to convert the message from binary data to network signals.

The message is then transmitted via an Internet Service Provider ("ISP") which examines the IP address of the message and routes the information to the computer with the proper IP address. When the message reaches its intended recipient, the receiving computer reverses the TCP/IP protocol stack and the message is decoded.

### Constitutional Considerations in Personal Jurisdiction

█ Because we have consistently held that the reach of the long arm statute is coextensive with the limits of personal jurisdiction delineated under the due process clause of the Federal Constitution, our statutory inquiry merges with our constitutional examination. *See Mohamed v. Michael,* 279 Md. at 656, 370 A.2d at 553; *Carefirst,* 334 F.3d at 396–97. A court's exercise of personal jurisdiction over a nonresident defendant satisfies due process requirements if the defendant has "minimum contacts" with the forum, so that to require the defendant to defend its interests in the forum state "does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95, 102 (1945).

### General Personal Jurisdiction

█ The standard for determining the existence of personal jurisdiction over a nonresident defendant depends upon whether the defendant's contacts with the forum state also provide the basis for the suit. If the defendant's contacts with the State are not the basis for the suit, then jurisdiction over the defendant must arise from the defendant's general, more persistent contacts with the State. "To establish general jurisdiction, the defendant's activities in the State must have been 'continuous and systematic.'" *Carefirst,* 334 F.3d at 397, quoting *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.,* 293 F.3d 707, 712 (4th Cir.2002), *cert. denied,* 537 U.S. 1105, 123 S.Ct. 868, 154 L.Ed.2d 773 (2003); *see Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 & n. 9, 104

S.Ct. 1868, 1872 & n. 9, 80 L.Ed.2d 404, 411 & n. 9 (1984). BSI has alleged both general and specific personal jurisdiction over Realtime Gaming and KDMS.

With respect to Maryland's ability to exercise general personal jurisdiction over Realtime Gaming and KDMS, BSI alleges that Realtime Gaming's website is "highly interactive" and permits the corporation to solicit business in Maryland, enter contracts, conduct sales, and accrue profits. Moreover, BSI asserts that the fact that the site links to other websites that have links to download KDMS's gaming software, which may be in use in Maryland, creates lines of communication with people in Maryland and sources of substantial revenue.

The first case explicating a model framework for exploring whether websites on the Internet can be used as a basis for conferring personal jurisdiction on the courts is *Zippo Manufacturing Co. v. Zippo Dot Com, Inc.*, 952 F.Supp. 1119 (W.D.Pa.1997). *See Toys "R" Us, Inc. v. Step Two S.A.*, 318 F.3d 446, 452 (3d Cir.2003) (stating that *Zippo* "has become a seminal authority regarding personal jurisdiction based upon the operation of an Internet website"); *Carefirst*, 334 F.3d at 399 (noting that *Zippo* "first enunciated that court's influential 'sliding scale' model" for applying personal jurisdiction requirements to electronic commerce); *Sublett v. Wallin*, 136 N.M. 102, 94 P.3d 845, 851 (App.2004) (observing that the sliding scale of interactivity was first articulated in *Zippo* ). In *Zippo*, an action arising out of a trademark violation alleged by Zippo Manufacturing Co., which produces lighters, against Zippo Dot Com, Inc., an online news service, the court suggested the use of a "sliding scale" of personal jurisdiction that is "directly proportionate to the nature and quality of commercial activity that an entity conducts over the Internet." *Zippo*, 952 F.Supp. at 1124. The *Zippo* court described it as a "spectrum" which:

[a]t one end ... are situations where a defendant clearly does business over the Internet. If the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper. *E.g.,*

*CompuServe, Inc. v. Patterson,* 89 F.3d 1257 (6th Cir.1996). At the opposite end are situations where a defendant has simply posed information on an Internet Website which is accessible to users in foreign jurisdictions. A passive Website that does little more than make information available to those who are interested in it is not grounds for the exercise of personal jurisdiction. *E.g., Bensusan Restaurant Corp. v. King,* 937 F.Supp. 295 (S.D.N.Y.1996). The middle ground is occupied by interactive Websites where a user can exchange information with the host computer. In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site. *E.g., Maritz, Inc. v. Cybergold, Inc.,* 947 F.Supp. 1328 (E.D.Mo. 1996).

*Zippo,* 952 F.Supp. at 1124.

In *Maritz, Inc. v. Cybergold, Inc.,* 947 F.Supp. 1328 (E.D.Mo.1996), the defendant hosted a website as a promotion for the launch of its Internet service. Although the service was not operational, visitors to the site were encouraged to add their address to a mailing list to receive its updates about the service. *Id.* at 1330. The plaintiff brought suit to recover for copyright infringement based upon the website's availability to consumers in Missouri. In rejecting the defendant's contention that it operated a "passive website," the court reasoned that the defendant's conduct amounted to "active solicitations" and "promotional activities" designed to "develop a mailing list of Internet users" and that the defendant "indiscriminately responded to every user" who accessed the site. *Id.* at 1333–34.

At the opposite end of the spectrum, the court in *Bensusan Restaurant Corp. v. King,* 937 F.Supp. 295 (S.D.N.Y.1996), concluded that the website at issue in that case did not enable the court to exercise personal jurisdiction over the defendant. The Internet website in issue contained general information about the defendant's club, a calendar of events, and ticket information. *Id.* at 297. The site was not interactive, and if a user wanted to go to the club, she would have to call or visit a

ticket outlet and then pick up tickets at the club on the night of the show. *Id.*

■ BSI contends that it has established a *prima facie* case for general jurisdiction based upon the *Zippo* sliding scale of interactivity of websites. In the proceedings before the trial court, BSI alleged that Realtime Gaming and KDMS's website is highly interactive without further factual support illustrating its interactivity or its use by residents of Maryland. In light of the dearth of evidence to the contrary, we find that the trial court's determination that Realtime Gaming and KDMS's website is not "highly interactive" is not clearly erroneous. Moreover, the *Zippo* scale is not particularly well-suited for use in the general personal jurisdiction inquiry [16] because "even repeated contacts with forum residents by a foreign defendant may not constitute the requisite substantial, continuous and systematic contacts required for a finding of general jurisdiction." *Revell v. Lidov,* 317 F.3d 467, 471 (5th Cir. 2002); *see also Bancroft & Masters, Inc. v. Augusta Nat'l Inc.,* 223 F.3d 1082, 1086 (9th Cir.2000) ("[E]ngaging in commerce with residents of the forum state is not in and of itself the kind of activity that approximates physical presence within the state's borders").

Irrespective of the sliding scale delineated in *Zippo,* the question of general jurisdiction is not difficult to resolve. Though the maintenance of a website is, conceivably, a continuous presence everywhere, the existence of a website alone is not sufficient to establish general jurisdiction in Maryland over Realtime Gaming and KDMS. BSI provided the trial court with no evidence beyond Realtime Gaming and KDMS's website, to establish substantial, continuous, systematic contacts with Maryland. Therefore, we conclude that the trial court properly determined that it lacked general jurisdiction over Realtime Gaming and KDMS.

---

16. In *Zippo,* the plaintiff had conceded that only specific jurisdiction was at issue. *Zippo,* 952 F.Supp. at 1122.

## Specific Personal Jurisdiction

 If the defendant's contacts with the forum state form the basis for the suit, however, they may establish "specific jurisdiction." *Carefirst*, 334 F.3d at 397. In determining whether specific jurisdiction exists, we consider (1) the extent to which the defendant has purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable. *Carefirst*, 334 F.3d at 397; *ALS Scan*, 293 F.3d at 711–12; *see Helicopteros*, 466 U.S. at 414 & n. 8, 104 S.Ct. at 1872 & n. 8, 80 L.Ed.2d at 411 & n. 8.

BSI asserts that it has established a *prima facie* case for specific jurisdiction over Realtime Gaming and KDMS because it has alleged that Realtime Gaming and KDMS own or control windowscasino.com, the company that assisted Thom in designing the website for the Golden Rhino Casino and the unsolicited commercial e-mails that BSI received. In support of this assertion, BSI notes that windowscasino.com has a link that leads to an IP address that is registered to Realtime Gaming and KDMS and that the e-mails at issue contained a link which ultimately led to the same IP address.

 Specifically, BSI must make a *prima facie* showing that an agency or contractual relationship exists between Realtime Gaming and KDMS and windowscasino.com. *See* Md.Code (1973, 2002 Repl.Vol.), § 6–103 of the Courts and Judicial Proceedings Article. An agency relationship "is a legal concept which depends upon the existence of required factual elements: the manifestation by the principal that the agent shall act for him, the agent's acceptance of the under-taking and the understanding of the parties that the principal is to be in control of the undertaking." Restatement (Second) of Agency § 1, cmt. (1958); *see Insurance Company of North America v. Miller*, 362 Md. 361, 373, 765 A.2d 587, 593 (2001); *Green v. H & R Block, Inc.*, 355 Md. 488, 503, 735 A.2d 1039, 1047 (1999). Although such a relationship is not necessarily

contractual in nature, it is always consensual. *Insurance Co. Of N. Amer.*, 362 Md. at 373, 765 A.2d at 593, citing *Lohmuller Bldg. Co. v. Gamble*, 160 Md. 534, 539, 154 A. 41, 43 (1931). The ultimate question is one of intent, of both the principal and the agent. *Id.; Howard Cleaners v. Perman*, 227 Md. 291, 295, 176 A.2d 235, 237 (1961). We have recognized three factors as having particular relevance to the determination of an agency relationship. These factors are:

(1) The agent's power to alter the legal relations of the principal;

(2) The agent's duty to act primarily for the benefit of the principal; and

(3) The principal's right to control the agent.

*Green*, 355 Md. at 503, 735 A.2d at 1048, citing *United Capitol Ins. v. Kapiloff*, 155 F.3d 488, 498 (4th Cir.1998); *Proctor v. Holden*, 75 Md.App. 1, 20, 540 A.2d 133, 142, *cert. denied sub nom.*, 313 Md. 506, 545 A.2d 1343 (1988); *Schear v, Motel Management Corp.*, 61 Md.App. 670, 687, 487 A.2d 1240, 1248 (1985) (stating the factors derive from sections 12–14 of the Restatement); Restatement (Second) of Agency §§ 12–14 (1958). The three factors are evaluated within the totality of the circumstances. *Green*, 355 Md. at 506, 735 A.2d at 1049. The presence of all three factors is not required for a finding of an agency relationship. *Id.*

The only evidence of any kind of relationship between Realtime Gaming and KDMS and windowscasino.com is the fact that the windowscasino.com website contains a link to an IP address registered to KDMS where customers can download the gaming software. This does not establish or even indicate a relationship, principal-agent or contractual, between Realtime Gaming and KDMS, on the one hand, and windowscasino.com on the other in which windowscasino.com is empowered to act on Realtime Gaming and KDMS's behalf or whether Realtime Gaming and KDMS control windowscasino.com. BSI does not provide any evidence of mutual corporate officers, board members, owners, or other such controlling individuals or entities to show anything more than that

windowscasino.com has obtained a sub-license from Montana Overseas. A mere link with no more compelling evidence is insufficient to create the necessary nexus between Realtime Gaming and KDMS, and windowscasino.com and Thom.[17]

Because BSI has failed to provide any evidence of a relationship among Realtime Gaming, KDMS, windowscasino.com, and Thom, that is either governed by a contract or possesses those qualities characteristic of agency relationships, we fail to see any substantive contact with Maryland or connection with the conduct giving rise to this suit, and as such find that it would not be constitutionally reasonable to exercise personal jurisdiction over Realtime Gaming and KDMS on these facts.

### The Denial of Discovery

BSI claims that the trial judge abused his discretion in ruling on the motion to dismiss at the May 26, 2004 hearing and in denying its request for discovery. We review the denial of discovery under the abuse of discretion standard and will only conclude that the trial court abused its discretion " 'where no reasonable person would take the view adopted by the [trial] court[ ]' ... or when the court acts 'without reference to any guiding principles,' and the ruling under consideration is 'clearly against the logic and effect of facts and inferences before the court[ ]' ... or when the ruling is 'violative of fact and logic.' " *Wilson v. Crane*, 385 Md. 185, 198, 867 A.2d 1077, 1084 (2005), quoting *In re Adoption/Guardianship No. 3598*, 347 Md. 295, 312–13, 701 A.2d 110, 118–19 (1997) (citations omitted). We do not find that the trial court's decision in the present case is beyond the decision that a reasonable person would make in light of the fact that BSI was unable to produce *any* evidence of a connection between Realtime Gaming and KDMS, on the one hand, and

---

17. BSI also asserts that Realtime Gaming and KDMS receive substantial revenue from citizens in Maryland through online casinos which use their software without any support. Visitors to windowscasino.com, for example, download the software designed by KDMS for free. BSI has failed to show any connection between Realtime Gaming and KDMS and windowscasino.com.

windowscasino.com and Thom, on the other, beyond a link leading to an IP address at which individuals could download the software designed by KDMS.

## Striking the Amended Complaint

■ On June 2, 2004, the trial court issued an order dismissing BSI's complaint that was silent as to whether the complaint was dismissed with or without prejudice. BSI argues that the trial court abused its discretion in striking the amended complaint that it filed and cites a number of this Court's cases for the proposition that a dismissal is without prejudice unless otherwise specified in the order of dismissal. *See, e.g., Williams v. Snyder,* 221 Md. 262, 157 A.2d 265 (1960); *State ex rel. Lennon v. Strazzella,* 331 Md. 270, 627 A.2d 1055 (1993). BSI also notes that Maryland Rule 2–341(c) provides that "[a]mendments shall be freely allowed when justice so permits." Despite the preference for freely permitted amendments, BSI failed to introduce any new facts to cure its inability to produce *prima facie* evidence of Maryland's personal jurisdiction over Realtime Gaming and KDMS. Therefore, we find that the trial court did not abuse its discretion in denying the motion for reconsideration and striking BSI's Amended Complaint.

## Conclusion

Because we find that the trial court properly concluded, based on the evidence introduced, that BSI failed to establish a *prima facie* case for general or specific personal jurisdiction over Realtime Gaming and KDMS, we affirm the trial court's order dismissing the complaint. Moreover, we conclude that the trial court did not abuse its discretion in denying BSI discovery or denying the motion for reconsideration and striking the amended complaint.

*JUDGMENT OF THE CIRCUIT COURT FOR MONT-GOMERY COUNTY AFFIRMED. COSTS TO BE PAID BY THE PETITIONER.*

RAKER, Judge, dissenting, in which BELL, Chief Judge, and HARRELL, Judge, join.

I would reverse the judgment of the Circuit Court because the court abused its discretion in denying petitioner BSI's request for further discovery as to jurisdictional facts. The Circuit Court granted respondents KDMS and Realtime's motion to dismiss the complaint on the grounds that respondents were not subject to the personal jurisdiction of the court and that petitioner was not entitled to discovery on the issue. The majority holds that the Circuit Court acted within its discretion to deny discovery "in light of the fact that BSI was unable to produce *any* evidence of a connection between Realtime Gaming and KDMS, on the one hand, and windows-casino.com and Thom, on the other, beyond a link leading to an IP address at which individuals could download the software designed by KDMS." Maj. Op. at 28–29, 878 A.2d 583–84 (emphasis in original). I disagree.

I agree that based on the record before the court, evidence of Maryland contacts was insufficient to subject respondents KDMS and Realtime to personal jurisdiction in Maryland. Discovery in this case was to close on September 27, 2004, with discovery requests to end by August 27, 2004. On May 26, 2004, the Circuit Court issued an order granting respondents' motion to dismiss for lack of personal jurisdiction and denying petitioner's discovery requests as to the jurisdiction issue. Petitioner filed a motion for reconsideration on June 11, 2004. On July 27, 2004, while the motion for reconsideration was pending, petitioner sent interrogatories and document requests to respondents, seeking discovery related to personal jurisdiction. The Circuit Court denied petitioner's motion for reconsideration on September 21, 2004. In my view, the court abused its discretion in denying petitioner discovery on the issue of personal jurisdiction.

The general rule is that a court should not dismiss a claim for lack of personal jurisdiction without permitting the plaintiff to obtain discovery as to jurisdictional facts. In *Androutsos v. Fairfax Hospital*, 323 Md. 634, 594 A.2d 574 (1991), the

Circuit Court had dismissed a negligence action for lack of personal jurisdiction without permitting the plaintiffs to obtain discovery as to the defendant's contacts with Maryland. In finding that the court had abused its discretion, we stated as follows:

> "[O]ur discovery rules, which are broad and comprehensive in scope, have as their principal objective the required disclosure of all relevant facts surrounding the litigation before the court. In *Baltimore Transit Co. v. Mezzanotti* [227 Md. 8, 13–14, 174 A.2d 768, 771 (1961) ], we reasoned:
>
>> 'If all of the parties have knowledge of all of the relevant, pertinent and non-privileged facts, or the knowledge of the existence or whereabouts of such facts, the parties should be able properly to prepare their claims and defenses, thereby advancing the sound and expeditious administration of justice. In order to accomplish the above purposes, the discovery rules are to be liberally construed. And the trial judges, who are primarily called upon to administer said rules, are vested with a reasonable, sound discretion in applying them, which discretion will not be disturbed in the absence of a showing of its abuse.'
>
> Nowhere is that rationale more applicable than when a fact-specific issue, such as whether the court can exercise personal jurisdiction over a non-resident defendant, is presented."

*Androutsos*, 323 Md. at 638, 594 A.2d at 576 (citations omitted).

Although the plaintiff in a civil action bears responsibility for establishing the defendant's amenability to suit, including personal jurisdiction, a complaint is required to contain "only such statements of fact as may be necessary to show the pleader's entitlement to relief." Md. Rule 2–303(b). Indeed, it is the defendant who must raise questions of personal jurisdiction at the pleading stage; under Maryland Rule 2–322(a) any defense to personal jurisdiction is waived if not raised before filing an answer to the complaint. *See Hansford*

*v. District of Columbia,* 329 Md. 112, 120, 617 A.2d 1057, 1060 (1993). Thus, a plaintiff bears no affirmative duty to plead personal jurisdiction in a complaint, and it is inappropriate ordinarily to grant a motion to dismiss based solely on the pleadings and to deny discovery on the issue of amenability to suit. *See, e.g., Edmond v. United States Postal Serv. Gen. Counsel,* 953 F.2d 1398, 1401 (D.C.Cir.1992) (Ginsberg, J., concurring); *Compagnie des Bauxites de Guinee v. L'Union Atlantique S.A. d'Assurances,* 723 F.2d 357, 362 (3rd Cir. 1983); *Leasco Data Processing Equip. Corp. v. Maxwell,* 468 F.2d 1326, 1343 (2d Cir.1972); *Surpitski v. Hughes–Keenan Corp.,* 362 F.2d 254, 255–56 (1st Cir.1966); *Hart Holding Co. Inc. v. Drexel Burnham Lambert, Inc.,* 593 A.2d 535, 538 (Del.Ch.1991); *Peterson v. Spartan Indus., Inc.,* 33 N.Y.2d 463, 354 N.Y.S.2d 905, 310 N.E.2d 513, 516 (1974).

In *Edmond,* then-Circuit Judge Ruth Bader Ginsburg noted the importance of affording a plaintiff "ample opportunity" to take discovery relevant to personal jurisdiction before dismissing a claim against a defendant:

"The ruling on personal jurisdiction over Popkin was premature in the absence of any discovery; in keeping with *Naartex [Consulting Corp. v. Watt,* 722 F.2d 779 (D.C.Cir. 1983), *cert. denied sub nom. Naartex Consulting Corp. v. Clark,* 467 U.S. 1210, 104 S.Ct. 2399, 81 L.Ed.2d 355 (1984) ], that ruling should have abided a fair opportunity for plaintiffs to pursue discovery keyed to the issue of personal jurisdiction."

*Edmond,* 953 F.2d 1398 at 1401.

In *Surpitski,* the United States Court of Appeals for the First Circuit noted as follows:

"A plaintiff who is a total stranger to a corporation should not be required, unless he has been undiligent, to try such an issue on affidavits without the benefit of full discovery.... The condemnation of plaintiff's proposed further activities as a 'fishing expedition' was unwarranted. When the fish is identified, and the question is whether it is in the

pond, we know no reason to deny a plaintiff the customary license."

*Surpitski,* 362 F.2d at 255–56.

The Delaware Court of Chancery addressed this issue in *Hart Holding Co.* and stated as follows:

"As a plaintiff does have an evidentiary burden, she may not be precluded from attempting to prove that a defendant is subject to the jurisdiction of the court, and may not ordinarily be precluded from reasonable discovery in aid of mounting such proof. *Surpitski v. Hughes–Keenan Corp.,* 362 F.2d 254, 255 (1st Cir.1966); *see* 5A Wright and Miller § 1351 n. 33. Only where the facts alleged in the complaint make any claim of personal jurisdiction over defendant frivolous, might the trial court, in the exercise of its discretionary control over the discovery process, preclude reasonable discovery in aid of establishing personal jurisdiction. *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 708, 102 S.Ct. 2099, 2107, 72 L.Ed.2d 492 (1982). In *Compagnie des Bauxites de Guinee v. L'Union Atlantique S.A. d'Assurances,* 723 F.2d 357 (3d Cir.1983), the Court of Appeals for the Third Circuit stated the general rule:

Where the plaintiff's claim is not clearly frivolous, the district court should ordinarily allow discovery on jurisdiction in order to aid the plaintiff in discharging that burden.

723 F.2d at 362.

It is relatively rare but not unheard of that a court will require a plaintiff to attempt to make out its *prima facie* factual showing of defendant's amenability to suit without the benefit of discovery. *See, e.g., Wyatt v. Kaplan,* 686 F.2d 276 (5th Cir.1982); *Daval Steel Products v. M.V. Juraj Dalmatinac,* 718 F.Supp. 159 (S.D.N.Y.1989); *Singer v. Bell,* 585 F.Supp. 300 (S.D.N.Y.1984); *Grove Valve & Regulator Co., Inc. v. Iranian Oil Services, Ltd.,* 87 F.R.D. 93 (S.D.N.Y.1980). While in each of these cases the court considered matters outside of the pleading, in each instance

the court found that plaintiff's assertion of personal jurisdiction lacked that minimal level of plausibility needed to permit discovery to go forward. No purpose is here served by detailing the facts presented in those cases; questions of this kind are inherently highly particular. But it is notable that, in *Wyatt v. Kaplan*, in approving the granting of a motion to dismiss under Rule 12(b)(2) where the plaintiff had been denied an opportunity to take depositions, the Fifth Circuit Court of Appeals strongly endorsed the practice that ordinarily permits discovery on such a motion:

> When a defendant challenges personal jurisdiction, courts generally permit depositions confined to the issues raised in the motion to dismiss.... In appropriate cases we will not hesitate to reverse a dismissal for lack of personal jurisdiction, on the ground that plaintiff was improperly denied discovery....

*Wyatt v. Kaplan*, 686 F.2d at 283."

*Hart Holding Co.*, 593 A.2d at 539–40.

This case is not one which falls into the category of "clearly frivolous." The elusive nature of Internet presence, together with the strong incentives for "spammers" to conceal their identities, portends that often there will be a dearth of jurisdictional facts in future cases brought under the Commercial Electronic Mail statute. The General Assembly has created a private cause of action to aid Maryland residents in the escalating battle against unsolicited, deceptive commercial e-mail. The effectiveness of that tool will be diminished if we close the courthouse door to plaintiffs without providing them the means to uncover facts that would support personal jurisdiction.

The e-mails at issue in this case were composed by an entity named windowscasino.com, and sent into Maryland by that entity through its "affiliate," Travis Thom. I disagree with the majority's conclusion that "BSI was unable to produce *any* evidence of a connection between Realtime Gaming and KDMS, on the one hand, and windowscasino.com and Thom,

on the other, beyond a link leading to an IP address at which individuals could download the software designed by KDMS."

BSI established three facts casting doubt on respondents' contention that windowscasino.com is, at most, a sub-licensee of KDMS software and has no agency relationship with respondents. First, the hyperlink "http://wincasinoclicks.com/ SmartDownload.asp?affid=13462" permitted Maryland recipients of the e-mail to download KDMS-designed software. Second, the domain name "wincasinoclicks.com" corresponds to an IP address registered to KDMS and Realtime. Thus, an e-mail recipient who clicked on the hyperlink would be downloading KDMS software *from a server belonging to KDMS.* Third, BSI's expert, Paul A. Wagner, stated in his affidavit that the "?affid=13462" portion of the hyperlink most likely served to identify the affiliate (in this case Travis Thom) who recruited the gambler. Assuming this uncontroverted allegation to be true, a KDMS-owned server was collecting information that could have been used to determine Travis Thom's compensation.

The relationship between respondents and windowscasino.com is shrouded in the mists of holding companies, offshore entities, and multi-level licensing arrangements. According to respondents, KDMS has entered into an exclusive license with a master licensee (Panama-based Montana Overseas). Montana Overseas, in turn, sub-licenses the software to many client casinos, among them windowscasino.com (seemingly a trade name of either Angel de la Mañana, a Costa Rican corporation, or ADLM, Ltd., located in the Channel Island of Jersey). Respondents assert that KDMS and Realtime have no direct relationship with their sub-licensees, and exercise no control over the manner in which the sub-licensees advertise their services. Under BSI's theory, on the other hand, the licensing and sub-licensing agreements are shams, Montana Overseas, Angel de la Mañana, and ADLM are mere dummy corporations, and windowscasino.com is a trade name or alter ego of KDMS/Realtime.

While the relationships may be exactly as KDMS and Realtime claim, the three facts detailed above provide some credence to BSI's theory. A KDMS-owned server is providing KDMS-developed software *directly* to end users. This server's collection of affiliate identification numbers suggests that KDMS and Realtime may have some role in the administration of windowscasino.com's affiliate commission system.

These facts alone do not establish an agency relationship between KDMS/Realtime and windowscasino.com, but they do render BSI's request for discovery something more than a "fishing expedition." BSI is entitled to more information regarding the connections among the various entities. Who owns Montana Overseas, Angel de la Mañana, and ADLM? Do these companies have any assets or employees? Who is acting as the "house" when a gambler bets at windowscasino.com? Do the purported licensing agreements between KDMS/Realtime, Montana Overseas, and Angel de la Mañana or ADLM actually exist, and if so, what do they contain? Is the software licensed for a flat fee, or do KDMS and Realtime receive an additional payment for each download? What aspects of windowscasino.com's business, if any, are run directly by KDMS and Realtime? Do KDMS and Realtime write advertising copy for windowscasino.com and its affiliates?

Answers to the above questions might establish that KDMS and Realtime merely develop software, provide some incidental hosting services, and can in no way be deemed to have purposefully "sent" Travis Thom's e-mails into Maryland. But they might also establish that the advertisement and the strategy for e-mailing it in bulk were the direct creations of KDMS and Realtime, hiding behind multiple layers of dummy corporations and sham licensees in an attempt to disguise their operation of a "spam"-dependent business.

I respectfully dissent.

Chief Judge BELL and Judge HARRELL have authorized me to state that they join in this dissenting opinion.